# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **Shamia Wilson, Angelo Jackson, Kwame Gordon, Christopher Drumgold**, individually, and on behalf of others similarly situated, | Case No. |
| Plaintiffs, | Hon. |
| v. | **Complaint** |
| **McDonald's Corporation; McDonald's USA, LLC; and Accell, LLC d/b/a McDonald's Restaurant**, | Jury Trial Demanded<br>Class and Collective Action |
| Defendants. | |

Edgar N. James (D.C. Bar No. 333013)
David P. Dean (D.C. Bar No. 437030)
Jeff Vockrodt (D.C. Bar No. 985635)
Darin M. Dalmat (D.C. Bar No. 978922)
Ryan E. Griffin (D.C. Bar No. 1007078)
JAMES & HOFFMAN, P.C.
1130 Connecticut Ave., Suite 950, NW
Washington, DC 20036
202-496-0500
202-496-0555 (fax)
ejames@jamhoff.com
dpdean@jamhoff.com
jvockrodt@jamhoff.com
dmdalmat@jamhoff.com
regriffin@jamhoff.com

John R. Canzano (MI Bar No. P30417)
Darcie R. Brault (MI Bar No. P43864)
McKNIGHT, McCLOW, CANZANO,
SMITH & RADTKE, P.C.
400 Galleria Officentre, #117
Southfield, MI 48034
248-354-9650
248-354-9656 (fax)
jcanzano@michworklaw.com
dbrault@michworklaw.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Introduction .................................................................................................1

Jurisdiction and Venue.............................................................................3

Parties.........................................................................................................3

I.    The Plaintiffs .......................................................................................3

II.   The Defendants ...................................................................................6

General Allegations...................................................................................9

I.    McDonald's Corporate, along with Moten McDonald's, employs Plaintiffs
and similarly situated Crew Members ...........................................9

    A. Moten McDonald's employs the Plaintiffs and similarly situated
       Crew Members, within the traditional common-law framework
       for master-servant employment relationships ...........................10

    B. McDonald's Corporate, along with Moten McDonald's, employs the
       Plaintiffs and similarly situated Crew Members, within the
       statutory framework for employment relationships established by
       the wage statutes .......................................................................11

       1) Like employees at all McDonald's restaurants, Plaintiffs and
          similarly situated Crew Members perform specialty jobs at
          Moten McDonald's on the production line developed and operated
          as the McDonald's System, which functions as an integrated
          economic unit ........................................................................12

       2) The responsibilities under McDonald's Franchise Agreements,
          like the one it has with Moten McDonald's, are materially the
          same across franchisees.......................................................17

       3) McDonald's Corporate's premises and equipment are used for
          Plaintiffs' and similarly situated Crew Members' work at
          Moten McDonald's...............................................................19

i

4) Moten McDonald's cannot, as a contractual or practical matter, shift its business organization as a unit from the McDonald's System to any other fast-food restaurant chain ...................................20

5) McDonald's Corporate keeps close tabs on Moten McDonald's operation ...........................................................................20

6) Although Moten McDonald's profits depend in part on the efficiency of its operation, the profitability of that franchised restaurant—like other McDonald's System restaurants—depends predominantly on decisions made by McDonald's Corporate and other factors outside of Moten McDonald's control, rather than on the initiative, judgment, or foresight of Moten McDonald's ...................................24

C. McDonald's Corporate, along with Moten McDonald's, also employs the Plaintiffs and similarly situated Crew Members, within the traditional common-law framework for master-servant employment relationships .................................................................................25

1) McDonald's Corporate substantially and effectively controls the hiring and firing of workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at Moten McDonald's restaurants ........................................................................25

2) McDonald's Corporate substantially and effectively controls the schedules of workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at Moten McDonald's restaurants ........................................................................27

3) McDonald's Corporate substantially and effectively controls other employment conditions of workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at Moten McDonald's restaurants ........................................................................29

4) McDonald's Corporate maintains extensive employment records relating to the work performed by workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at Moten McDonald's restaurants ..............................................34

II.     Plaintiffs and similarly situated Crew Members have been engaged to wait without receiving minimum wages—or any compensation at all —for that compensable work .......................................................... 35

III.    Plaintiffs and similarly situated Crew Members have had the cost of their required uniforms deducted from their wages, driving those wages below the minimum wage required by the wage statutes ........................................ 38

IV.     Notwithstanding their extensive recordkeeping, McDonald's Corporate and Moten McDonald's have failed to keep fully accurate records required by law ........................................................................................... 40

V.      McDonald's Corporate and Moten McDonald's have committed these violations willfully .................................................................... 40

Collective Actions Allegations ........................................................ 41

Class Action Allegations ................................................................. 43

First Cause of Action: Waiting-Time Violations of the FLSA ............................... 46

Second Cause of Action: Uniform-Deduction Violations of the FLSA ................. 47

Third Cause of Action: Waiting-Time Violations of the MWL ............................. 48

Fourth Cause of Action: Uniform-Deduction Violations of the MWL ................. 49

Fifth Cause of Action: Breach of Contract Under Michigan Common Law .......... 50

Sixth Cause of Action: Unjust Enrichment (Quantum Meruit) Under Michigan Common Law ................................................................................ 51

Jury Demand ................................................................................ 52

Prayer for Relief ........................................................................... 52

## Introduction

1.  McDonald's is a chain of fast-food restaurants, some owned and operated by the chain's corporate parents and others by franchisees. Together, both types of restaurants and the corporate parents (who are also the franchisor) form a unified business system—the self-proclaimed McDonald's System—that operates through uniform standards established and monitored by the chain's corporate parents, with the dominant aim of making the corporate parents profitable and the secondary aim of ensuring profitability for the component parts, so as to contribute to the profitability of the McDonald's System as a whole.  As such, the McDonald's System functions in reality as an integrated economic unit. By adhering consistently to the corporate standards, the McDonald's System generated $27 billion dollars in revenue last year, while nominally paying minimum wages to the vast majority of its workers—the people who cook and serve its world-famous hamburgers, ring up its customers, clean its restaurants, and present the face of Ronald McDonald to the world.

2.  The Plaintiffs in this case work at franchised McDonald's restaurants in the Detroit metropolitan area. They bring this Complaint on behalf of themselves and their hundreds of fellow Crew Members who work for the same franchisee.

3.  They have come to this Court seeking relief for two kinds of violations of federal and state wage laws.

4.  First, they challenge McDonald's practice of just-in-time labor staffing. Under that practice, McDonald's carefully schedules the labor it needs each week to maximize daily profits, using sales projections based on historical data. When a

1

day's sales do not keep up with those projections, McDonald's makes just-in-time adjustments to its staffing requirements by taking employees off the clock—and off the payroll—for the minutes or, sometimes, even hours that McDonald's determines necessary to maintain its profit targets at every moment throughout the day. Meanwhile, those workers—who had been scheduled to work that day—must wait. They cannot effectively use that time to work at another job or even to enjoy their leisure.

5. Wilson, Jackson, and the entire McDonald's Crew have the right to be paid fair compensation for their work. When McDonald's engages them to work by waiting idly until business picks up again, the law requires it to pay them at least minimum wages for that time. Wilson, Jackson, and their colleagues, however, have not been paid at all for the time that McDonald's engaged them to wait. They now seek relief for that injury from this Court.

6. Second, Wilson, Jackson, and their colleagues challenge McDonald's practice of charging them for the Golden Arches uniforms it requires them to wear to minimum-wage work.  McDonald's has invested significantly over the years in the value of its image. It profits by advertising its instantly-identifiable logo throughout the world. Usually, McDonald's pays for the cost of that advertising. But not always: McDonald's also advertises its Golden Arches by requiring Wilson, Jackson, and their colleagues to wear Golden Arches uniforms to perform work at McDonald's. McDonald's requires these minimum-wage workers to pay for the costs of that advertising by making them purchase their uniforms. In conscripting its employees' work clothes for its advertising space at the

2

employees' expense, McDonald's drives their actual hourly wages below legally required minimums. The Plaintiffs also seek relief for that injury.

## Jurisdiction and Venue

7.  This Complaint alleges causes of action under a law of the United States, the Fair Labor Standards Act ("**FLSA**"), 29 U.S.C. §§ 201, *et seq.* This Court therefore has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.

8.  This Complaint also alleges causes of action under the laws of the State of Michigan, including the Minimum Wage Law of 1964 ("**MWL**"), Mich. Comp. Laws §§ 408.381, *et seq.*, and common law. The state-law causes of action alleged in this Complaint are so related to the federal-law claims in this action that they form part of the same case or controversy under Article III of the United States Constitution. This Court thus has subject-matter jurisdiction under 28 U.S.C. § 1367 over the state-law claims.

9.  Each of the Defendants in this action resides in this judicial district within the meaning of 28 U.S.C. § 1391(d). Venue is thus proper here under 28 U.S.C. § 1391(b)(1).

10. A substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district. Venue is thus also proper here under 28 U.S.C. § 1391(b)(2).

## Parties

## I.  The Plaintiffs

11. **Shamia Wilson** is a Michigan resident.

3

   a. From approximately April 2013 through February 2014, she was employed at the McDonald's restaurant located at 22021 W. 8 Mile Road in Detroit, Michigan.

   b. Throughout that employment, she was at least 16 years of age.

   c. Throughout that employment, Wilson was paid on an hourly basis.

   d. Her nominal rate of pay throughout that employment was $7.45 per hour.

   e. Wilson's duties during that employment included, among other things, working as a cashier.

   f. Wilson's written consent to join this action is attached as Exhibit A to this Complaint.

12. **Angelo Jackson** is a Michigan resident.

   a. From about October or November 2013 through the present, he has been employed at the McDonald's restaurant located at 28670 Northwestern Highway in Southfield, Michigan.

   b. Throughout that employment, he has been at least 16 years of age.

   c. Throughout that employment, Jackson has been paid on an hourly basis.

   d. Her nominal rate of pay throughout that employment has been $7.50 per hour.

   e. Jackson's duties during that employment include, among other things, cooking on the grill.

   f. Jackson's written consent to join this action is attached as Exhibit B to this Complaint.

13. **Kwame Gordon** is a Michigan resident.

4

   a. From about September 2013 through the present, he has been employed at the McDonald's restaurant at 24480 Telegraph Road in Southfield, Michigan.

   b. Throughout that employment, he has been at least 16 years of age.

   c. Throughout that employment, Gordon has been paid on an hourly basis.

   d. His nominal rate of pay throughout that employment has been $7.40 per hour.

   e. Gordon's duties during that employment include, among other things, working on the grill and preparing food.

   f. Gordon's written consent to join this action is attached as Exhibit C to this Complaint.

14. **Christopher Drumgold** is a Michigan resident.

   a. From about May 2012 through the present, he has been employed at the McDonald's restaurant at 19102 Woodward Avenue in Detroit, Michigan.

   b. Throughout that employment, he has been at least 16 years of age.

   c. Throughout that employment, Drumgold has been paid on an hourly basis.

   d. His nominal rate of pay throughout that employment has been $7.40 per hour.

   e. Drumgold's written consent to join this action is attached as Exhibit D to this Complaint.

15. Plaintiffs Wilson, Jackson, Gordon, and Drumgold are "employee[s]" within the meaning of 29 U.S.C. § 203(e)(1) and Mich. Comp. Laws § 408.382(b).

16. This Complaint refers collectively to Plaintiffs Wilson, Jackson, Gordon, and Drumgold as "**Plaintiffs**."

17. As alleged in more detail below, *see infra* ¶ 21(a)–(d), numerous other employees worked at McDonald's restaurants in Michigan owned and operated by Ron Moten, the owner of Accell LLC d/b/a McDonald's Restaurant. The overwhelming majority of those employees were paid on an hourly basis to perform similar tasks to those performed by the Plaintiffs. This Complaint refers to those people as "**Crew Members.**"

## II.  The Defendants

18. **McDonald's Corporation** is a Delaware corporation.

   a. Its principal place of business is One McDonald's Plaza, Oak Brook, Illinois 60523.

   b. Its corporate system includes more than 35,000 restaurants, spanning all 50 states—including Michigan—and at least 119 countries worldwide.

   c. On information and belief, these operations generated more than $27 billion in annual revenue each year during the period relevant to this action.

   d. At all times relevant to this action, McDonald's Corporation has been an enterprise engaged in commerce or in the production of goods for commerce, as those terms are used in 29 U.S.C. § 203(s).

19. **McDonald's USA, LLC** is a Delaware corporation.

6

    a.  It is a wholly-owned subsidiary of McDonald's Corporation.

    b.  Its principal place of business is One McDonald's Plaza, Oak Brook, Illinois 60523.

    c.  Its corporate system includes more than 14,000 restaurants throughout the United States and Canada, approximately 90% of which—over 12,000—are franchised.

    d.  On information and belief, these operations have generated more than $8 billion in annual revenue each year during the period relevant to this action.

    e.  At all times relevant to this action, McDonald's USA, LLC has been an enterprise engaged in commerce or in the production of goods for commerce, as those terms are used in 29 U.S.C. § 203(s).

20. This Complaint refers collectively and/or alternatively, as appropriate, to McDonald's Corporation and McDonald's USA, LLC as "**McDonald's Corporate**."

21. Accell LLC d/b/a McDonald's Restaurant ("**Moten McDonald's**") is a Michigan business owned by Ron Moten.

    a.  On information and belief, Moten McDonald's maintains its principal place of business at 24725 W. Twelve Mile Rd., Ste. 380 in Southfield, Michigan  48034.

    b.  On information and belief, Moten McDonald's operates at least 5 restaurants in or around Detroit, Michigan, including at 22021 W. 8 Mile Road, Detroit, Michigan; 15550 W. McNichols, Detroit, Michigan;

7

31325 Orchard Lake Rd., Farmington Hills, Michigan; 24480 Telegraph / Ten Mile, Southfield, Michigan; and 28670 Northwestern Hwy., Southfield Michigan.

c. On information and belief, Moten McDonald's operates these restaurants pursuant to a franchise agreement with McDonald's Corporate.

d. On information and belief, during the relevant time period, Moten McDonald's has employed several hundred or more people to work in its 5 restaurants.

e. On information and belief, Moten McDonald's has generated at least $500,000 in annual gross volume or sales made or business done in each year during the period relevant to this action.

f. At all times relevant to this action, Moten McDonald's has been an enterprise engaged in commerce or in the production of goods for commerce, as those terms are used in 29 U.S.C. § 203(s).

22. McDonald's Corporation is an "employer" within the meaning of 29 U.S.C. § 203(d) and Mich. Comp. Laws § 408.382(c).

23. McDonald's USA LLC is an "employer" within the meaning of 29 U.S.C. § 203(d) and Mich. Comp. Laws § 408.382(c).

24. Moten McDonald's is an "employer" within the meaning of 29 U.S.C. § 203(d) and Mich. Comp. Laws § 408.382(c).

## General Allegations

**I.    McDonald's Corporate, along with Moten McDonald's, employs Plaintiffs and similarly situated Crew Members.**

25. Under both the FLSA and the MWL (collectively, "**wage statutes**"), an employer "employs" an employee if it "suffer[s] or permit[s]" him or her "to work." 29 U.S.C. § 203(g); Mich. Comp. Laws § 408.382(d).

26. For the purposes of the wage statutes, a "single individual may stand in the relation of an employee to two or more employers at the same time … ." 29 C.F.R. § 791.2(a).

27. A master-servant relationship under traditional common-law agency principles is sufficient, but not necessary, to demonstrate an employment relationship for the purposes of the wage statutes.

28. Under traditional agency principles, a "servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." Restat. (Second) of Agency, § 220(1).

29. Even where a business does not exercise the degree of control necessary to employ a worker under traditional agency principles, the business will still be deemed an employer of that worker for the purposes of the wage statutes if economic reality, considered as a whole, reveals that the business suffered or permitted the worker to work.

**A. Moten McDonald's employs the Plaintiffs and similarly situated Crew Members, within the traditional common-law framework for master-servant employment relationships.**

30. Plaintiffs and similarly situated Crew Members perform services for Moten McDonald's, which controls or has the right to control the performance of those services.

31. Moten McDonald's hired Plaintiffs and similarly situated Crew Members.

32. Moten McDonald's has the power to fire or otherwise terminate the employment of Plaintiffs and similarly situated Crew Members.

33. Moten McDonald's, through its General Managers and Shift Supervisors, supervises and controls Plaintiffs' and similarly situated Crew Members' work schedules. Moten McDonald's managers typically post the weekly schedules for Plaintiffs and similarly situated employees on a weekly basis. Those schedules are generally posted in an area in the back of the restaurant. Plaintiffs and similarly situated Crew Members typically learn when they are scheduled to work either by reviewing the posted weekly schedule or by calling a manager and asking for their schedule for that week.

34. Moten McDonald's, through its General Managers and Shift Supervisors, supervises and controls other conditions of Plaintiffs' and similarly situated Crew Members' employment.

35. Moten McDonald's, through its General Managers and Shift Supervisors, also assigns Plaintiffs and similarly situated Crew Members to positions within each restaurant, such as cash register operator, drive-through front-booth order taker, drive-through back-booth food deliverer, food runner, grill operator, table

10

operator / sandwich assembler, and cleaners and others with janitorial responsibility for maintaining the cleanliness of the lobby and restrooms.

36. Moten McDonald's determines the wage rates and methods of payment for Plaintiffs and similarly situated workers. On information and belief, Moten McDonald's, through its management, directly determines the nominal rate of pay for Plaintiffs and similarly situated Crew Members.

37. At all times relevant to this action, Moten McDonald's set each Plaintiff's nominal rate of pay at $7.40 per hour, or within 10 cents of that rate.

38. On information and belief, at all times relevant to this action, Moten McDonald's set each similarly situated Crew Members' nominal rate of pay at or close to $7.40 per hour.

39. On information and belief, Moten McDonald's maintains certain employment records for Plaintiffs and similarly situated Crew Members. Those records include, among others, hours employees are scheduled to work; hours employees are recorded by the computer system as having worked; wages paid; discipline issued; and payroll taxes deducted.

**B. McDonald's Corporate, along with Moten McDonald's, employs the Plaintiffs and similarly situated Crew Members, within the statutory framework for employment relationships established by the wage statutes.**

40. McDonald's Corporate, along with Moten McDonald's, suffered or permitted Plaintiffs and similarly situated Crew Members to work.

1) **Like employees at all McDonald's restaurants, Plaintiffs and similarly situated Crew Members perform specialty jobs at Moten McDonald's on the production line developed and operated as the McDonald's System, which functions as an integrated economic unit.**

41. According to its public filings, McDonald's Corporate develops, operates, maintains, franchises, and services a system of restaurants that prepare assemble, package, and sell a limited menu of value-priced foods as the **"McDonald's System"** in the United States.

42. According to its public filings, the McDonald's System comprises a system of restaurant operations that includes, among other things, certain rights in trademarks, manuals, and other confidential business information; operational, real estate, and marketing information; and the expertise and continuing information that McDonald's Corporate provides to the component parts of the McDonald's System.

43. On information and belief, approximately 15,500 restaurants operate in the United States and Canada as the McDonald's System in those countries. According to its public filings, approximately 89% of those restaurants are operated as McDonald's franchised restaurants, like Moten McDonald's, and approximately 11% are owned and operated directly by McDonald's Corporate.

44. According to McDonald's Corporate's public filings, the McDonald's System is designed to offer the public a high standard of uniformity in food, service, and décor. Those filings also reveal that McDonald's Corporate has never offered franchises in any other line of business.

45. On information and belief, McDonald's Corporate has established a "**QSC Play Book**" that sets forth standards on Quality, Service, and Cleanliness McDonald's Corporate has established for the entire McDonald's System.

46. On information and belief, in the QSC Play Book, Jeff Stratton, McDonald's Corporate's Chief Restaurant Officer, states that "[e]ach time we deliver an exceptional customer experience, it brings our customers back, increases their brand loyalty, and makes the entire McDonald's system more profitable."

47. On information and belief, the QSC Play Book states that McDonald's System's "operations are composed of a set of systems that work together for the overall objective of the whole."

48. According to its public filings, McDonald's Corporate develops the overall direction and strategy for advertising and marketing programs throughout the McDonald's System. McDonald's Corporate permits franchisees, including Moten McDonald's, to use only advertising and marketing materials and programs that McDonald's Corporate has itself provided to McDonald's franchisees or approved in advance in writing.

49. On information and belief, McDonald's Corporate standard Franchise Agreement provides that "the essence of this Franchise is the adherence by Franchisee to standards and policies of McDonald's Corporate providing for the uniform operation of all McDonald's restaurants within the McDonald's System including, but not limited to, serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; strict adherence to designated food and beverage specifications and to McDonald's

13

Corporate prescribed standards of Quality, Service, and Cleanliness in the
Restaurant operation." The Franchise Agreement further provides that
"[c]ompliance by Franchisee with the foregoing standards and policies in
conjunction with the McDonald's trademarks and service marks provides the basis
for the valuable goodwill and wide family acceptance of the McDonald's System."

50. On information and belief, McDonald's Corporate's standard Franchise
Agreement requires the McDonald's Franchisee to acknowledge "that every
component of the McDonald's System is important to McDonald's and to the
operation of the Restaurant as a McDonald's restaurant, including a designated
menu of food and beverage products; uniformity of food specifications,
preparations methods, quality, and appearance; and uniformity of facilities and
**service.**" (Emphasis added.)

51. According to its public filings, McDonald's Corporate generates substantial
revenue by charging its franchised restaurants, like Moten McDonald's, a variety
of fees. On information and belief, those fees are uniform across the McDonald's
System and include:

    a.  an initial franchise fee, typically $45,000;

    b.  rent, assessed by McDonald's Corporate as the sum of monthly base rent
(based upon the amount McDonald's Corporate invested in the
acquisition and development of the land and building used by the
franchised restaurant) and an additional fixed percentage rent (also a
function of McDonald's Corporate investment in the land and building,
but payable only if the franchisee's monthly gross sales exceed the

14

monthly base sales figure computed by dividing the dollar amount of the monthly base rent by the fixed percentage rent), both components of which are determined solely by McDonald's Corporate;

c. a monthly service fee equivalent to 4% of gross sales revenues from business conducted at the franchised restaurants;

d. fees for advertising, payable to local advertising cooperatives and McDonald's Corporate national advertising fund;

e. fees for audits and inspections of the franchised restaurants by McDonald's Corporate, payable if the audit or inspection shows an understatement of at least 2% of the franchisee's gross sales;

f. fees associated with software McDonald's Corporate requires its franchised restaurants to use, such as McDonald's Corporate proprietary "**Point of Sale"** software (the current version of which is called "**NewPOS**"), its "**Regional Restaurant Data Diagnostics"** or "**R2D2**" Software, Restaurant System Management software, Restaurant Integrated Data Movement software, software for McDonald's Corporate's back office suite, software used to manage the security of restaurant Crew Members, email accounts, and other technology required by McDonald's Corporate;

g. service fees to McDonald's Corporate for providing guarantees on loans for franchisees—a figure that alone exceeded $24 million in proceeds to McDonald's Corporate in 2012; and,

h. several other miscellaneous fees.

15

52. According to its public filings, the rent and fees McDonald's Corporate collects from McDonald's franchisees generated about $4.3 billion in revenue in 2012 for McDonald's USA LLC—nearly half of that Defendant's total revenue in 2012.

53. On information and belief, McDonald's Corporate also exercises substantial control over its franchisees' operations.

54. According to its public filings, McDonald's Corporate determines, in its sole discretion, the products that may be sold at restaurants in the McDonald's System, including franchised restaurants such as Moten McDonald's.

55. According to its public filings, McDonald's Corporate maintains uniformity throughout the McDonald's System by identifying standards for the purchasing, distribution, preparation, and service of goods, services, supplies, fixtures, equipment, inventory, and computer hardware and software.

56. Those filings also reveal that McDonald's Corporate requires its franchisees to deal only with suppliers that McDonald's Corporate has approved.

57. According to its public filings, the purchases McDonald's Corporate requires of its franchisees—including items that must be purchased from McDonald's Corporate itself or from a McDonald's Corporate-approved supplier in accordance with McDonald's Corporate specifications—amounted, at all times relevant to this action, to more than 90% of the cost of establishing a franchised restaurant and to approximately 60–67% of the cost of operating a franchised restaurant.

16

58. The McDonald's System accordingly functions in reality as a tightly integrated economic unit.

59. Plaintiffs and similarly situated Crew Members at Moten McDonald's perform work in a discrete role within the integrated economic unit that is the McDonald's System: they are the workers who prepare, cook, and deliver the food that is the McDonald's System's ultimate product in much of Detroit; they are the workers who clean the stores where that food is delivered; and they are the workers who deal directly with its customers.

60. The work performed by Plaintiffs and similarly situated Crew Members is comparable to and follows the usual path of work performed by hourly workers employed directly by McDonald's Corporate at its corporate-owned stores and by workers at other McDonald's stores operated as franchised restaurants in other locations.

### 2) The responsibilities under McDonald's Franchise Agreements, like the one it has with Moten McDonald's, are materially the same across franchisees.

61. On information and belief, McDonald's Corporate enters into the same, or materially the same, Franchise Agreement with each of the approximately 12,000 restaurants it franchises within the United States, including Moten McDonald's.

62. On information and belief, the material terms of the standard Franchise Agreement include, without limitation:

a. a 20-year term;

b. McDonald's Corporate's sole right, at its discretion, to renew or extend the Franchise Agreement at the end of the term;

c. no right of the franchisee to terminate the Agreement;

d. the right of McDonald's Corporate to terminate the Agreement for cause, including, among others, the failure to maintain the restaurant in a good, clean, wholesome manner and in compliance with McDonald's System standards, violation of franchise restrictions, knowing sale of foods other than those approved by McDonald's System or those that fail to conform to McDonald's System standards, denial of access to McDonald's, or any conduct that damages the McDonald's System's reputation;

e. McDonald's Corporate's right of first refusal to acquire the franchisee's business by matching any offer; and,

f. prohibitions on the franchisee's involvement in competing or similar business during the term of the franchise, and further prohibitions on involvement in competing business within 10 miles for 18 months after the termination or expiration of the franchise.

63. On information and belief, McDonald's franchisees, including Moten McDonald's, have insufficient bargaining power to negotiate different terms from those offered by McDonald's Corporate in its standard Franchise Agreement.

### 3) McDonald's Corporate's premises and equipment are used for Plaintiffs' and similarly situated Crew Members' work at Moten McDonald's.

64. According to its public filings, McDonald's Corporate selects the site where each of its franchised restaurants, including Moten McDonald's, will be located; franchisees, including Moten McDonald's, do not select or approve those locations.

65. According to its public filings, McDonald's Corporate owns the land and buildings used by its franchised restaurants, including Moten McDonald's, for their operations.

66. According to its public filings, McDonald's Corporate retains the right to access the premises of its franchisees, including Moten McDonald's, throughout the term of the Franchise Agreement.

67. According to its public filings, to ensure uniformity throughout the McDonald's System, McDonald's Corporate requires its franchisees, including Moten McDonald's, to use only equipment that meets standards established by McDonald's Corporate for purchasing, distribution, preparations and service of goods, services, supplies, fixtures, equipment, inventory, and computer hardware and software.

68. On information and belief, Moten McDonald's, like other McDonald's franchisees, must purchase that equipment either directly from McDonald's Corporate or from McDonald's Corporate-approved suppliers.

19

69. On information and belief, all of the equipment Plaintiffs and similarly situated Crew Members use for their work at Moten McDonald's must meet the standards established by McDonald's Corporate for the McDonald's System.

### 4) Moten McDonald's cannot, as a contractual or practical matter, shift its business organization as a unit from the McDonald's System to any other fast-food restaurant chain.

70. On information and belief, the Franchise Agreement between Moten McDonald's and McDonald's Corporate contains a non-compete provision that completely prohibits Moten McDonald's from involvement during the term of that Agreement in any competing or similar business.

71. On information and belief, the Franchise Agreement between Moten McDonald's and McDonald's Corporate contains a non-compete provision that prohibits Moten McDonald's from involvement for 18 months after the end of the Agreement in any competing business within 10 miles of Moten McDonald's.

72. On information and belief, as a matter of economic reality in light of its substantial investments, Moten McDonald's cannot go into business with any fast-food restaurant chain other than the McDonald's System.

### 5) McDonald's Corporate keeps close tabs on Moten McDonald's operation.

73. On information and belief, McDonald's Corporate requires its franchisees, including Moten McDonald's, to use a variety of software applications—collectively referred to as "**Store Systems**."

74. According to public filings, the required Store Systems include:

    a. a proprietary hardware and software platform—called "**POS,**" for Point of Sale, or "**NewPOS**"—that is integrated to the service and production systems of McDonald's System restaurants;

    b. the In Store Processor ("**ISP**"), which is a proprietary computer platform that uses server computer hardware that operates with other software McDonald's Corporate requires; and,

    c. the Regional Restaurant Data Diagnostics system ("**R2D2**"), which provides restaurant operators with reports to improve restaurant operations and which McDonald's Corporate uses to verify sales information at restaurants throughout the McDonald's System.

75. On information and belief, the Store Systems integrate production and service systems in all McDonald's System restaurants and compile information including sales, transactions, product mix, and cash control.

76. On information and belief, the Store Systems also compile inventory, labor, and payroll information used in managing restaurants within the McDonald's System.

77. Plaintiffs and similarly situated Crew Members are required to clock in and out by logging into the Store Systems through the cash registers, using a unique employee identification number. On information and belief, McDonald's Corporate had the ability to, and in fact did, monitor the hours that franchisee employees—including Plaintiffs and similarly situated Crew Members—worked "on the clock," as reflected in the Store Systems.

21

78. On information and belief, the Store Systems calculate the "**labor cost percentage**" at any particular restaurant throughout the McDonald's System, including Moten McDonald's, by dividing (a) the wages, benefits, and other labor costs associated with the store employees clocked in at any given time by (b) the gross sales revenue received by the store at that time.

79. According to public filings, McDonald's Corporate has independent access to restaurant-level information—including at Moten McDonald's—generated and tracked by the Store Systems, such as the labor cost percentage, and there are no contractual limits on McDonald's Corporate's right to access such information.

80. On information and belief, McDonald's Corporate does in fact closely monitor the information generated and tracked by the Store Systems, including the labor cost percentage at its franchised restaurants, including at Moten McDonald's.

81. On information and belief, McDonald's Corporate requires that the Store System is configured to generate a Daily Activity Report for all restaurants throughout the McDonald's System, including Moten McDonald's. On information and belief, these Daily Activity Reports include information about daily employee hours worked on the clock, sales made, the customer count, the drive-through window sales count, transactions per worker-hour, and the labor cost percentage of sales. On information and belief, these Daily Activity Reports are updated at least once per hour.

82. According to public filings, McDonald's Corporate also requires its franchisees, including Moten McDonald's, to provide monthly reports on restaurant receipts and other financial and operating information. On information

22

and belief, McDonald's Corporate required these monthly reports to confirm the data previously reported by the Store Systems.

83. On information and belief, McDonald's Corporate also regularly audits and inspects franchisee operations, including at Moten McDonald's, through the use of Business Consultants, who are directly employed by McDonald's Corporate.

84. On information and belief, these Business Consultants conduct Full Operations Reviews and Short Operations Reviews multiple times per year.

85. On information and belief, during these reviews, McDonald's Corporate, through its Business Consultants, evaluates whether its franchisees—including Moten McDonald's—are meeting McDonald's System standards with respect to employee orientations, disciplinary policies and procedures, employee scheduling, employee wages, and employee training, among other matters.

86. In addition to these reviews, on information and belief, McDonald's Corporate also conducts "mystery shops" of its franchised restaurants, including Moten McDonald's. It typically does so on a monthly basis.

87. On information and belief, McDonald's Corporate uses these reviews and mystery shops to determine whether cause exists to terminate a given franchisee's Franchise Agreement or to fail to renew any Franchise Agreement that has reached the end of its term.

88. On information and belief, McDonald's Corporate also uses these reviews and mystery shops to make recommendations about how franchisee operations that fail to conform with standards—including Quality, Service, and Cleanliness

23

("**QSC**") standards—established by McDonald's Corporate can improve their performance.

6) **Although Moten McDonald's profits depend in part on the efficiency of its operation, the profitability of that franchised restaurant—like other McDonald's System restaurants—depends predominantly on decisions made by McDonald's Corporate and other factors outside of Moten McDonald's control, rather than on the initiative, judgment, or foresight of Moten McDonald's.**

89. According to its public filings, the purchases McDonald's Corporate requires of its franchisees—including items that must be purchased from McDonald's Corporate itself or from a McDonald's Corporate approved supplier in accordance with McDonald's Corporate specifications—amounted, at all times relevant to this action, to more than 90% of the cost of franchisees establishing their restaurants and to approximately 60–67% of the cost of franchisees operating their restaurants.

90. On information and belief, the extent of those start-up and operating costs McDonald's Corporate requires of its franchisees, including Moten McDonald's, dramatically circumscribes the ability of franchisees to make profit through their own initiative, judgment, or foresight. On the contrary, on information and belief, the profit opportunities for McDonald's franchisees, including Moten McDonald's, are predominately determined by decisions made by McDonald's Corporate and by other factors outside the control of Moten McDonald's.

**C. McDonald's Corporate, along with Moten McDonald's, also employs the Plaintiffs and similarly situated Crew Members, within the traditional common-law framework for master-servant employment relationships.**

91. Plaintiffs and similarly situated Crew Members perform services for McDonald's Corporate, which controls or has the right to control the performance of those services.

**1) McDonald's Corporate substantially and effectively controls the hiring and firing of workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at Moten McDonald's restaurants.**

92. On information and belief, McDonald's Corporate provides its franchisees, including Moten McDonald's, a "Retention & Staffing Guidebook," which covers everything McDonald's Corporate believes franchisees need to know and do to fully diagnose and manage their staffing situations.

93. On information and belief, McDonald's Corporate provides this Guidebook through the McDonald's Service Center to assist franchisees in retaining and hiring managers and Crew Members.

94. On information and belief, McDonald's Corporate provides its franchisees, including Moten McDonald's, a "Quality Hiring Training Manual," which instructs franchisees how to conduct reference checks as a necessary step in the hiring process.

95. On information and belief, McDonald's Corporate provides its franchisees, including Moten McDonald's, a "People Forecasting Tool," which instructs franchisees on how to predict their staffing needs—both for managers and for Crew Members.

96. As it does for every state in the United States, McDonald's Corporate maintains a website that lists all McDonald's System restaurants (whether franchised or corporate-owned), job opportunities, and events in Michigan. The Michigan-specific website is www.mcmichigan.com.

97. McDonald's Corporate uses this website to recruit managers and hourly employees to its restaurants, including franchised restaurants like Moten McDonald's. Specifically, in March 2014, McDonald's Corporate's McMichigan website advertised job openings at all five restaurants operated by Moten McDonald's.

98. On information and belief, the McDonald's Corporate's McMichigan website requires job applicants to answer a questionnaire as part of the application process. On information and belief, McDonald's Corporate developed the questionnaire. On information and belief, once a job applicant completes that questionnaire, McDonald's Corporate assigns a score to the candidate based on the answers provided; based on those scores, McDonald's Corporate then makes a recommendation to the owner and hiring manager of the restaurant—whether corporate-owned or franchised—that posted the job opening on whether the applicant is a good risk to hire.

99. On information and belief, when McDonald's Corporate's Business Consultants conduct Full or Short Operations Reviews of restaurants within the McDonald's System—including franchised restaurants, like Moten McDonald's—they review, among other things, whether the restaurant is following the crew and management hiring and orientation process established by McDonald's Corporate.

26

**2) McDonald's Corporate substantially and effectively controls the schedules of workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at Moten McDonald's restaurants.**

100.   On information and belief, McDonald's Corporate business manuals—including the Retention & Staffing Guidebook, the O&T Manual, the People Forecasting Tool, and other materials—provide McDonald's franchisees, including Moten McDonald's, detailed instructions for calculating the number of employees that should be staffed at varying intervals.

101.   On information and belief, a manager at a McDonald's System restaurant creates weekly schedules by entering the date of a given week in the ISP, which uses historical sales data to project sales in that week. The ISP then uses those sales projections to generate a proposed schedule.

102.   On information and belief, McDonald's Corporate then expects its restaurant managers—including those at franchised restaurants, like Moten McDonald's—to determine the variable labor needs on an hourly basis using the "**Positioning Guide,**" which is a guide developed by McDonald's Corporate to advise managers of restaurants throughout the McDonald's System of where to position workers within each store.

103.   Once the manager has determined labor needs on an hourly basis, he or she can modify the proposed schedule generated by the ISP based on external events he or she expects. At this stage, the proposed schedule has not yet assigned particular employees to positions during a shift. Those assignments are then made either automatically if the manager has previously programmed ratings of

27

employees' proficiency at different positions, or manually if the General Manager has not preprogrammed the proficiency ratings.

104.  On information and belief, during Full and Short Operations Reviews McDonald's Corporate Business Consultants assess restaurants throughout the McDonald's System—including franchised restaurants, like Moten McDonald's—on whether Crew Members at a particular restaurant are positioned in accordance with projected transactions or sales and the recommended positioning guide.

105.  On information and belief, McDonald's Corporate develops labor cost percentage targets for each restaurant in the McDonald's System. On information and belief, for franchised restaurants, McDonald's Corporate develops the labor cost percentage target in consultation with the owner-operator of the restaurant. On information and belief, these targets vary based on, among other factors, the amount of capital McDonald's Corporate initially invested in establishing the restaurant.

106.  On information and belief, McDonald's Corporate advises, trains, and instructs store managers throughout the McDonald's System—including at franchised restaurants like Moten McDonald's—to adjust staffing levels and reduce employees' on-the-clock hours when the actual labor cost percentage exceeds the labor cost percentage target. On information and belief, a McDonald's manual instructs franchised restaurants in regard to "Critical ISP Reports" that "[y]ou need to set-up targets for when transactions are plus or minus so you can decide when to add or cut labor."

28

107.  Plaintiffs have each had their work schedules adjusted on multiple occasions when the actual labor cost percentage exceeded the labor cost percentage target for the restaurant where he or she works or worked.

108.  Managers have made these adjustments in a few ways. Sometimes they directed Plaintiffs or similarly situated Crew Members who arrived ready, willing, and able to work at the start of their scheduled shift to wait until the labor cost percentage no longer exceeded the labor cost percentage target before clocking in to work. On other occasions, Plaintiffs or similarly situated Crew Members had already clocked in when the labor cost percentage exceeded the target, and managers directed Plaintiffs or similarly situated Crew Members to clock out and take an unscheduled break until the labor cost percentage no longer exceeded the target before clocking back in to work.

109.  On information and belief, these adjustments were made in accordance with standards and practices established by McDonald's Corporate, as well as in accordance with training provided by McDonald's Corporate.

110.  On information and belief, McDonald's Corporate Business Consultants admonish restaurant managers to control labor costs and adjust labor to achieve labor cost percentage targets.

### 3) McDonald's Corporate substantially and effectively controls other employment conditions of workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at Moten McDonald's restaurants.

111.  According to its public filings, McDonald's Corporate has established and strictly enforces high quality standards and product specifications.

29

112.  According to its public filings, McDonald's Corporate's ability to increase sales and profits depends, among other things, on its ability to motivate its franchisees to achieve consistency and high service levels so as to improve perceptions of the McDonald's System's ability to meet expectations for quality food served in clean and friendly environments.

113.  On information and belief, McDonald's Corporate operates Hamburger University, the training center for the worldwide McDonald's System.

114.  On information and belief, McDonald's Corporate trains franchisee owners and operators, including those from Moten McDonald's, on a basic curriculum, known as the Restaurant Department Management curriculum. On information and belief, franchisee owners and operators must complete the Restaurant Department Management curriculum to be qualified to operate a McDonald's System restaurant. As part of this curriculum, McDonald's Corporate trains the franchisee owners and operators on how to meet McDonald's System standards in areas like equipment, standard operations, controls, and leading people.

115.  On information and belief, McDonald's Corporate also requires each franchised restaurant to have at least one General Manager who has completed training at Hamburger University.

116.  On information and belief, among other things, the Restaurant Department Management curriculum requires franchisees to complete a Department Manager Learning Plan on "Wage and Hour."

117.  On information and belief, any employee working as a Crew Member at any restaurant in the McDonald's System has to complete training provided by McDonald's Corporate to be promoted to a crew trainer, shift manager, or first assistant manager.

118.  On information and belief, McDonald's Corporate's Franchise Agreement obligates it to provide its franchisees, including Moten McDonald's, with McDonald's System business manuals, including its Operations and Training Manual ("**O&T Manual**"). Those manuals are incorporated by reference into the Franchise Agreement itself.

119.  According to McDonald's Corporate public filings, the O&T manual contains detailed information prepared by McDonald's Corporate, including the operations procedures McDonald's Corporate requires.

120.   On information and belief, the O&T Manual contains a chapter on Human Resources, which covers, among other things, McDonald's System philosophy and policies, Crew Member and management recruitment, Crew Member and Management selection, Crew Member and management retention, Crew Member and Management communication, performance development system for management, performance and wage reviews for hourly employees, recognition and incentives, handling terminations, people practice diagnostic tools, benefits and compensation, Crew rooms, uniforms, record retention and security, training and reference materials, and other information.

121.  On information and belief, the O&T Manual specifically advises franchisees, including Moten McDonald's, on federal wage and hour laws, standby

31

time, overtime pay, federal child labor laws, uniforms, and record retention, among other matters.

122.  On information and belief, the O&T Manual establishes standards with which McDonald's Corporate expects franchisees, including Moten McDonald's, to comply in regards to uniforms and grooming.

123.  On information and belief, the O&T Manual establishes standards with which McDonald's Corporate expects franchisees, including Moten McDonald's, to comply in regards to the retention of employment records, including which records must be retained, for how long, and by what methods.

124.  On information and belief, the policies and procedures McDonald's Corporate sets forth in the Human Resources chapter of the O&T Manual and elsewhere substantially affect the relationship between Plaintiffs and similarly situated Crew Members, on the one hand, and Moten McDonald's, on the other.

125.  On information and belief, during Full and Short Operations Reviews, McDonald's Corporate Business Consultants determine whether cashiers and other franchisee workers properly address customers, for example, by saying "Thank you. Please come again," rather than "Have a nice day." On information and belief, McDonald's Corporate Business Consultants grade franchises, including Moten McDonald's, on the service provided by these Crew Members.

126.  On information and belief, McDonald's Corporate provides franchisees, including Moten McDonald's, guidelines on whether to give employees raises above the minimum wage, and, if so, when and how much. These guidelines are generally based on periodic performance reviews.

32

127.  On information and belief, when McDonald's Corporate's Business Consultants conduct Full or Short Operations Reviews of restaurants in the McDonald's System—including franchised restaurants, like Moten McDonald's— the Consultants assess the restaurant's compliance with wage review policies established by McDonald's Corporate.

128.  On information and belief, McDonald's Corporate has provided employees throughout the McDonald's System—including those who work at corporate-owned and at franchised restaurants—a "Practical Money Skills: Budget Journal," which purports to advise employees how to learn to spend and save wisely based on the wages they receive for their work in the McDonald's System of restaurants. The sample monthly budget proposed by McDonald's Corporate Budget Journal does not include among the monthly expenses any entry devoted to clothes, much less to required work uniforms.

129.  On information and belief, McDonald's Corporate promulgates guidelines to its restaurants, including franchisees like Moten McDonald's, that specify cooking times to the second and temperatures to the degree.

130.  On information and belief, during Full and Short Operations Reviews McDonald's Corporate Business Consultants assess restaurants, including franchised restaurants like Moten McDonald's, on the amount of time down to the second that it takes employees to serve customers at different positions throughout the store.

33

**4) McDonald's Corporate maintains extensive employment records relating to the work performed by workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at Moten McDonald's restaurants.**

131.  As alleged above, McDonald's Corporate collects vast amounts of employment records relating to the work performed at its franchisees, including by Plaintiffs and similarly situated Crew Members. *See supra* ¶¶ 73–88.

132.  On information and belief, McDonald's Corporate does so through its Store Systems (*i.e.*, its POS, ISP, R2D2, and other required computer systems), which collect and record information relating to hours recorded as worked and labor costs (including the amounts paid in wages and benefits to Crew Members).

133.  On information and belief, this information is recorded in real-time at its franchised restaurants, including Moten McDonald's, and collected on a daily basis or more frequently at the discretion of McDonald's Corporate Business Consultants.

134.  On information and belief, McDonald's Corporate Business Consultants maintain records of the performance of franchisee employees, including Plaintiffs and similarly situated Crew Members, as observed by the Business Consultants in the course of their Full and Short Operations Reviews.

135.  On information and belief, as part of those Full and Short Operations Reviews, McDonald's Corporate Business Consultants also ensure that franchised restaurants, including Moten McDonald's, are themselves maintaining all employment records that McDonald's Corporate requires its franchises to maintain.

II.     **Plaintiffs and similarly situated Crew Members have been engaged to wait without receiving minimum wages—or any compensation at all— for that compensable work.**

136.  On information and belief, McDonald's Corporate maintains a practice or procedure of establishing a labor cost percentage target for each restaurant throughout the McDonald's System, including Moten McDonald's.

137.  On information and belief, McDonald's Corporate requires each restaurant throughout the McDonald's System, including Moten McDonald's, to monitor periodically throughout the day the actual labor costs as a percentage of sales revenue at that store.

138.  On information and belief, the R2D2 software provides hourly reports of actual labor costs and of sales and service, which together report the labor cost percentage. On information and belief, McDonald's Corporate has access to these hourly reports.

139.  On information and belief, when a restaurant's labor cost percentage exceeds its target, McDonald's Corporate expects its managers, including those at franchised restaurants like Moten McDonald's, to remove employees from the previously established work schedule to reduce labor costs.

140.  Each Plaintiff in this case has, on several occasions, reported to work as scheduled, ready, willing, and able to work, but, upon arrival, received a direction from his or her manager not to clock in at the scheduled time or, after clocking in, to take an extended or extra unpaid break. On those occasions, the manager has generally explained that the employee would not be permitted to clock in as scheduled or would have to go off the clock because "business is slow" or "labor

35

costs are high." The manager generally did not definitively inform any Plaintiff when he or she would be permitted to clock in; rather, the manager generally told each Plaintiff that he or she would have to wait for business to pick up or labor costs to go down before he or she would be allowed to clock in. On those occasions, each Plaintiff typically waited between 15 minutes and an hour, although sometimes more, before being permitted to clock in. Each Plaintiff usually waited on these occasions either in the lobby, the crew room in the back of the store, or the parking lot near the store. None of the Plaintiffs was able to use this waiting time effectively for his or her own purposes on any of these occasions. None of the Plaintiffs has been paid for the time he or she spent waiting on these occasions for labor costs to decrease.

    a. Wilson estimates that approximately once a week, her shift manager told her to take an extra break off the clock because labor costs were high. Those breaks were in addition to her usual 30-minute lunch break. She estimates that the extra breaks lasted, on average, approximately 30 minutes. On those occasions, she generally waited in the crew room at the store until her manager told her to clock in again. She saw most, if not all, of her coworkers receive similar instructions to take extra breaks during periods in which labor costs were high.

    b. Jackson estimates that approximately four times in the four or five months he has worked at McDonald's, his managers told him not to clock in at the start of his scheduled shift because labor costs were high. He estimates that he generally waited between 30 minutes and one hour on

36

these occasions before being allowed to clock in. He generally waited in the crew room on those occasions. He has seen other Crew Members receive similar instructions from management to wait before clocking in because labor costs were high at the scheduled start of their shifts.

c. Gordon estimates that approximately twice since September 2013, when he started working at McDonald's, his managers told him not to clock in at the scheduled start of his shift, but, instead, to wait until one of the managers told him to clock in. On those occasions, he was told that he could not clock in because there were too many people working. He typically had to wait between 15 and 20 minutes each time before clocking in. He generally waited either in the lobby or the break room. He has seen several of his coworkers receive similar instructions to wait to clock in, rather than clocking in at their scheduled time, because there were too many people clocked in at the scheduled time. Based on those observations, he believes that the practice is common at the store where he works.

d. Drumgold estimates that approximately one or twice each week since he started working at McDonald's in May 2012, he has been told not to clock in at his scheduled time but instead to wait until one of the managers told him to clock in. When this has happened, his managers typically told him to wait because labor costs are high. He generally has had to wait between 30 minutes and an hour. He generally waits in the crew room until told to clock in. He has seen other employees receive

37

similarly treatment and estimates that they, too, generally wait 30 minutes to an hour on average; they, too, generally wait in the crew room for further instructions.

141. On information and belief, similarly situated Crew Members have also had to wait to clock in or to take extended or extra mid-shift breaks due to labor cost percentages that exceeded the target established for Moten McDonald's.

**III.  Plaintiffs and similarly situated Crew Members have had the cost of their required uniforms deducted from their wages, driving those wages below the minimum wage required by the wage statutes.**

142. The Plaintiffs and similarly situated Crew Members receive nominal rates of pay at or near $7.40 per hour.

143. The Plaintiffs and similarly situated Crew Members are required, as a term of their employment, to wear uniforms to work. Those uniforms include, among other articles of clothing, shirts and hats bearing the McDonald's logo.

144. Articles of clothing bearing the McDonald's logo are not generally suited to be worn on non-working occasions.

145. The costs of purchasing these uniforms have been deducted from several Plaintiffs' wages, and, on information and belief, from the wages of numerous similarly situated Crew Members.

    a. Wilson had to buy two shirts, a cap, a visor, and a nametag when she started working. The cost of each item was deducted from her paycheck. She has heard from at least one coworker that the cost of Crew Members' uniforms is generally deducted from their first paycheck. Based on her

own experience and the experience of her colleague, Wilson believes this practice to be common at Moten McDonald's.

b. Jackson had to buy two shirts, a hat, an apron and a nametag as part of his required uniform. The cost of each of these items was deducted from his paycheck. A few of his coworkers also told him that the costs of their uniforms were also deducted from their paychecks. Jackson has also seen a recurring uniform deduction on his paycheck, which is labeled "Recurring Uniform Ded." He does not know why this deduction is taken from his checks. At least one other employee has told Jackson that she has also had a recurring uniform deduction.

c. Gordon was given two McDonald's shirts and one McDonald's apron as part of his uniform when he joined McDonald's. The cost of these items was deducted from his initial paychecks, as was the cost of a McDonald's hat, even though management did not provide the latter but Gordon had to get one from a friend. Gordon has talked with three or four of his coworkers about paycheck deductions for uniforms; each told Gordon that the cost of his or her uniform was also deducted from his or her paycheck. Gordon accordingly believes that this practice is common at his store.

d. Drumgold received two shirts and two hats when he joined McDonald's; the cost of each item was deducted from his paycheck. He has talked with approximately ten coworkers about the issue, and each of them reports

39

that the cost of uniforms was also deducted from his or her paycheck. He therefore believes that this practice is common at his store.

146.  Those deductions have caused several Plaintiffs and similarly situated Crew Members to receive regular rates of pay less than $7.40 per hour in some workweeks.

147.  Those deductions have caused several Plaintiffs and similarly situated Crew Members to receive regular rates of pay less than $7.25 per hour in some workweeks.

## IV.  Notwithstanding their extensive recordkeeping, McDonald's Corporate and Moten McDonald's have failed to keep fully accurate records required by law.

148.  On information and belief, neither McDonald's Corporate nor Moten McDonald's has kept accurate records of the time Plaintiffs and similarly situated Crew Members spent waiting to clock in or on downtime breaks, as described above in ¶¶ 107–08.

149.  Those failures violate McDonald's Corporate's and Moten McDonald's obligations under 29 U.S.C. § 211 and applicable Department of Labor regulations.

## V.  McDonald's Corporate and Moten McDonald's have committed these violations willfully.

150.  On information and belief, McDonald's Corporate O&T Manual advises franchisees, including Moten McDonald's that "Federal wage and hour laws were created to protect the rights of employees. These laws ensure that employees are fairly paid for all hours worked and all hours for which employees are required to be present in the restaurant, such as standby time and training time." On

40

information and belief, the McDonald's Corporate O&T Manual also recognizes that employees perform compensable work by appearing for an assigned shift and then being told by management to wait to clock in until business in the restaurant gets busier.

151.  In light of the foregoing, McDonald's Corporate and Moten McDonald's knew at all times relevant to this action of their obligations under the wage statutes.

152.  Despite that knowledge, McDonald's Corporate and Moten McDonald's unlawfully deprived Plaintiffs and similarly situated Crew Members of legally required compensation for all hours worked, both by failing to pay them for all hours that they were engaged to wait and by deducting the costs of uniforms from their wages. McDonald's Corporate and Moten McDonald's did so either knowing that their conduct violated the wage statutes or in reckless disregard for whether their actions complied with the wage statutes.

## Collective Action Allegations

153.  Plaintiffs hereby incorporate the allegations of all preceding paragraphs by reference as if set forth fully herein.

154.  Plaintiffs bring the FLSA claims in this action as a collective action under 29 U.S.C. §216(b).

155.  Plaintiffs assert those claims on behalf of themselves and of all similarly situated Crew Members employed by Defendants, or any one of them, who were not paid all compensation required by the FLSA during the relevant time period as a result of Defendants' compensation policies and practices, including its policies and practices relating to waiting-time and uniform deductions.

41

156.  Plaintiffs seek to notify the following Crew Members of their right under 29 U.S.C. § 216(b) to join this action by filing in this Court written notice of their consent to join the action:

> All individuals who worked at any time during the relevant time period for any restaurant owned or operated by Accell LLC d/b/a McDonald's Restaurant, and who were paid for their work on an hourly basis.

157.  The FLSA provides for a three-year statute of limitations for causes of action arising out of a willful violation of that Act. 29 U.S.C. § 255. As alleged above, *see supra* ¶¶ 150–52, Plaintiffs' and similarly situated Crew Members' claims arise out of Defendants' willful violations of the FLSA. Accordingly, the Court should require appropriate notice of this action be given to all Crew Members employed by Moten McDonald's within three years from the filing of this Complaint.

158.  On information and belief, Moten McDonald's has employed several hundred Crew Members during the period relevant to this action.

159.  The identities of these Crew Members, as a group, are known only to the Defendants. Because the numerous members of this collective action are unknown to Plaintiffs, joinder of each member is not practicable.

160.  Because these similarly situated Crew Members are readily identifiable to the Defendants and may be located through their records, they may be readily notified of this action and allowed to opt into it pursuant to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their FLSA claims.

161.  Collective adjudication is appropriate in this case because the Crew Members whom Plaintiffs wish to notify of this action have been employed in positions similar to the Plaintiffs; have performed work similar to the Plaintiffs; and have been subject to compensation practices similar to the Plaintiffs, including the unlawful waiting-time and uniform-deduction policies and practices alleged above. *See supra* ¶ 108.

## Class Action Allegations

162.  Plaintiffs hereby incorporate the allegations of all preceding paragraphs by reference as if set forth fully herein.

163.  Plaintiffs bring their state-law claims in this action as a class action under Fed. R. Civ. P. 23(b)(3).

164.  Plaintiffs seek Rule 23 certification of the following class ("**Class**"):

> All individuals who worked at any time during the relevant time period for any restaurant owned or operated by Accell LLC d/b/a McDonald's Restaurant, and who were paid for their work on an hourly basis.

165.  The MWL provides for a three-year statute of limitations. Mich. Comp. Laws § 408.393(1). The relevant time period therefore dates back three years from the date on which this Complaint was filed and continues forward through the date of judgment.

166.  The individuals in the Class are so numerous that joinder of all members is impracticable. Although the precise number of Moten McDonald's Crew Members is currently unknown to the Plaintiffs, Plaintiffs belief that the Class contains several hundred individuals.

43

167.  There are questions of law or fact common to the Class. These questions include, but are not limited, to:

a.  whether Moten McDonald's employs the Class members;

b.  whether McDonald's Corporate employs the Class members;

c.  whether McDonald's Corporate and/or Moten McDonald's maintains a policy or practice of engaging its employees to wait without paying them minimum wages as required by the wage statutes; and,

d.  whether McDonald's Corporate and/or Moten McDonald's maintains a policy or practice of deducting the cost of uniforms from its employees, thereby driving their effective wages below the minimum wages required by the wage statutes.

168.  The questions of law or fact common to the Class are capable of classwide resolution, as follows:

a.  Whether Moten McDonald's employs the Class members can be proven based on employment records Moten McDonald's maintains, examination of which will not require individualized inquiries at trial.

b.  Whether McDonald's Corporate employs the Class members can be proven through an examination of economic reality and, in particular, of the economic relationship between Moten McDonald's and McDonald's Corporate. The nature of that relationship is an objective matter that will resolve the question of McDonald's Corporate's employment relationship with the Class members in one stroke, without the need for individualized inquiries at trial.

44

c. Whether McDonald's Corporate and/or Moten McDonald's maintains a policy or practice of engaging Class members to wait without paying them lawfully required minimum wages can be proven through analysis of Defendant's scheduling records, records of hours worked, payroll records, records of labor cost percentage targets, and records of actual labor cost percentages. Because these records are objective evidence, their analysis will resolve the question of compensable waiting time in one stroke, without the need for individualized inquiries at trial.

d. Whether McDonald's Corporate and/or Moten McDonald's maintains a policy or practice of deducting the cost of required uniforms from Class members and effectively driving their wages below lawful minimums can be proven through invoice and payroll records. Because these records are objective evidence, their analysis will resolve the question of uniform deductions in one stroke, without the need for individualized inquiries at trial.

169.  Plaintiffs' claims are typical of those of the Class. Plaintiffs, like other Class members, were denied lawfully required minimum wages under the wage statutes on account of the waiting-time and uniform-deduction claims alleged here. Plaintiffs challenge these common practices under legal theories common to all Class members.

170.  Plaintiffs and undersigned counsel are adequate representatives of the Class. Plaintiffs are Class members, with concrete incentives to prosecute this action. Plaintiffs are committed to the prosecution of this action. Plaintiffs have no

45

known interests that are antagonistic to those of the Class or that would cause them to act adversely to the best interests of the Class. Plaintiffs have retained counsel experienced in class action litigation, including disputes involving wage statutes.

171.  The questions of law and fact set forth above, *supra* ¶ 167(a)–(d), predominate over any questions affecting only individual Class members, because they are capable of classwide resolution without the need for individualized inquiries at trial.

172.  A class action is superior to other methods for the fair and efficient adjudication of this matter.

### First Cause of Action: Waiting-Time Violations of the FLSA

173.  Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

174.  At relevant times, Moten McDonald's suffered or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of 29 U.S.C. § 203(g).

175.  At relevant times, McDonald's Corporate suffered or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of 29 U.S.C. §203(g).

176.  At all times relevant to this action, Plaintiffs and similarly situated Crew Members have been entitled under 29 U.S.C. §206(a) to wages at rates not less than $7.25 per hour for the hours they worked.

177.  At times within the relevant time period, Plaintiffs and similarly situated Crew Members were engaged to wait and thus performed compensable work, but received no compensation for that work.

178.  The Defendants are liable to Plaintiffs and similarly situated Crew Members, under 29 U.S.C. § 216(b), for their unpaid wages, liquidated damages (equal to the amount of unpaid wages), reasonable attorney's fees and costs, and any other relief deemed appropriate by the Court.

**Second Cause of Action: Uniform-Deduction Violations of the FLSA**

179.  Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

180.  At relevant times, Moten McDonald's suffered or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of 29 U.S.C. § 203(g).

181.  At relevant times, McDonald's Corporate suffered or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of 29 U.S.C. §203(g).

182.  At all times relevant to this action, Plaintiffs and similarly situated Crew Members have been entitled under 29 U.S.C. §206(a) to wages at rates not less than $7.25 per hour for the hours they worked.

183.  Under 29 U.S.C. § 203(m), wages paid to any employee include the reasonable cost to the employer of furnishing certain facilities provided by the employer to an employee primarily for the benefit and convenience of the employee.

47

184.  Where an employer requires an employee to wear a uniform as a condition of employment, the cost of that uniform is primarily for the benefit and convenience of the employer, not the employee. 29 C.F.R. § 531.3(d)(2). The cost of such uniforms accordingly cannot be credited toward "wages" paid to an employee.

185.  Defendants required Plaintiffs and similarly situated Crew Member to pay for the costs of their required McDonald's uniforms. When they did so, the Defendants deducted those costs from Plaintiffs' and similarly situated Crew Members' wages, driving their effective wages below the $7.25 hourly rate required under 29 U.S.C. § 206(a).

186.  The Defendants are liable to Plaintiffs and similarly situated Crew Members, under 29 U.S.C. § 216(b), for their unpaid wages, liquidated damages (equal to the amount of unpaid wages), reasonable attorney's fees and costs, and any other relief deemed appropriate by the Court.

### Third Cause of Action: Waiting-Time Violations of the MWL

187.  Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

188.  At relevant times, Moten McDonald's engaged, suffered, or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of Mich. Comp. Laws § 408.382(d).

189.  At relevant times, McDonald's Corporate engaged, suffered, or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of Mich. Comp. Laws § 408.382(d).

48

190.  At all times relevant to this action, Plaintiffs and similarly situated Crew Members have been entitled under Mich. Comp. Laws § 408.384(d) to wages at rates not less than $7.40 per hour for the hours they worked.

191.  At times within the relevant time period, Plaintiffs and similarly situated Crew Members were engaged to wait and thus performed compensable work, but received no compensation for that work.

192.  The Defendants are liable to Plaintiffs and similarly situated Crew Members, under Mich. Comp. Laws § 408.393(1), for their unpaid wages, liquidated damages (equal to the amount of unpaid wages), reasonable attorney's fees and costs, and any other relief deemed appropriate by the Court.

**Fourth Cause of Action: Uniform-Deduction Violations of the MWL**

193.  Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

194.  At relevant times, Moten McDonald's engaged, suffered, or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of Mich. Comp. Laws §408.382(d).

195.  At relevant times, McDonald's Corporate engaged, suffered, or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of Mich. Comp. Laws §408.382(d).

196.  At all times relevant to this action, Plaintiffs and similarly situated Crew Members have been entitled under Mich. Comp. Laws § 408.384(d) to wages at rates not less than $7.40 per hour for the hours they worked.

49

197.  Although the MWL does not expressly define "wages," it is interpreted in accordance with the use of that term under the FLSA.

198.  Under 29 U.S.C. § 203(m), wages paid to any employee include the reasonable cost to the employer of furnishing certain facilities provided by the employer to an employee primarily for the benefit and convenience of the employee.

199.  Where an employer requires an employee to wear a uniform as a condition of employment, the cost of that uniform is primarily for the benefit and convenience of the employer, not the employee. 29 C.F.R. §531.3(d)(2). The cost of such uniforms accordingly cannot be credited toward "wages" paid to an employee.

200.  Defendants required Plaintiffs and similarly situated Crew Members to pay for the costs of their required McDonald's uniforms. When they did so, the Defendants deducted those costs from Plaintiffs' and similarly situated Crew Members' wages, driving their effective wages below the $7.40 hourly rate required under Mich. Comp. Laws § 408.384(d).

201.  The Defendants are liable to Plaintiffs and similarly situated Crew Members, under Mich. Comp. Laws § 408.393(1), for their unpaid wages, liquidated damages (equal to the amount of unpaid wages), reasonable attorney's fees and costs, and any other relief deemed appropriate by the Court.

**Fifth Cause of Action: Breach of Contract Under Michigan Common Law**

202.  Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

50

203. By scheduling Plaintiffs and similarly situated Crew Members to work, Moten McDonald's and McDonald's Corporate offered to pay those workers at least their nominal rate of pay for all hours scheduled.

204. By reporting to work as scheduled, Plaintiffs and similarly situated Crew Members accepted Defendants' offers.

205. Based on the schedules offered, Plaintiffs and similarly situated Crew Members had a legitimate expectation that they would be permitted to work as scheduled.

206. Defendants' offers and Plaintiffs' and similarly situated Crew Members' acceptances together formed a contract.

207. Defendants breached that contract by refusing to pay Plaintiffs and similarly situated Crew Members for all hours they had been scheduled to work.

208. Defendants are liable to Plaintiffs and similarly situated Crew Members for actual and consequential damages on account of their breach of contract.

### Sixth Cause of Action: Unjust Enrichment (Quantum Meruit) Under Michigan Common Law

209. Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

210. By scheduling Plaintiffs and similarly situated Crew Members to work, but paying those workers to work only when the labor cost percentage did not exceed the target, McDonald's Corporate and Moten McDonald's obtained a substantial benefit—namely, a just-in-time supply of labor. Because McDonald's

Corporate and Moten McDonald's failed to pay for that benefit, they were unjustly enriched, to the detriment of Plaintiffs and similarly situated Crew Members.

211.  McDonald's Corporate and Moten McDonald's appreciated and knew of the benefits being conferred upon them by Plaintiffs and similarly situated Crew Members who were engaged to wait.

212.  McDonald's Corporate and Moten McDonald's conduct was willful and not the result of mistake or inadvertence. In consequence, it would be inequitable for McDonald's Corporate or Moten McDonald's to retain the benefits they received without paying for the value of those benefits.

213.  Defendants are liable to Plaintiffs and similarly situated Crew Members in quantum meruit, together with an award of interests and costs.

## Jury Demand

214.  Plaintiffs respectfully request a jury trial on all matters so triable.

## Prayer for Relief

WHEREFORE, Plaintiffs respectfully pray for the following relief from this Court:

(a) Certify the federal-law claims in this case as a collective action under Section 16(b) of the FLSA, 29 U.S.C. § 216(b);

(b) Require that notice of their right to join this action by filing with this Court written consent to do so be given to all Crew Members similarly situated to Plaintiffs;

(c) Certify the state-law claims in this case as a class action under Fed. R. Civ. P. 23;

52

(d) Grant judgment against Defendants, jointly and severally, and in favor of each Plaintiff and similarly situated Crew Member on all claims in this case;

(e) Award each Plaintiff and similarly situated Crew Member all unpaid wages required by law;

(f) Award each Plaintiff and similarly situated Crew Member all liquidated damages provided by law;

(g) Award each Plaintiff and similarly situated Crew Member all other nominal, compensatory, or statutory damages, or damages of any other kind;

(h) Award restitution of all monies due Plaintiffs and similarly situated Crew Members, as well as all disgorged profits from the unlawful business practices of Defendants;

(i) Award interest;

(j) Award reasonable attorney's fees and costs;

(k) Grant all other and further relief as the Court deems just and proper.


Respectfully submitted,

/s/ David P. Dean
Edgar N. James (D.C. Bar No. 333013)
David P. Dean (D.C. Bar No. 437030)
Jeff Vockrodt (D.C. Bar No. 985635)
Darin M. Dalmat (D.C. Bar No. 978922)
Ryan E. Griffin (D.C. Bar No. 1007078)
JAMES & HOFFMAN, P.C.
1130 Connecticut Ave., Suite 950, NW
Washington, DC 20036
202-496-0500
202-496-0555 (fax)

ejames@jamhoff.com
dpdean@jamhoff.com
jvockrodt@jamhoff.com
dmdalmat@jamhoff.com
regriffin@jamhoff.com

John R. Canzano (MI Bar No. P30417)
Darcie R. Brault (MI Bar No. P43864)
McKNIGHT, McCLOW, CANZANO, SMITH &
RADTKE, P.C.
400 Galleria Officentre, #117
Southfield, MI 48034
248-354-9650
248-354-9656 (fax)
jcanzano@michworklaw.com
dbrault@michworkerlaw.com

Date: March 13, 2014

54